WOODARD

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Cr. No.: 21-20199-JTF |
| ) | |
| vs. ) | 18 U.S.C. § 2 |
| ) | 18 U.S.C. § 1347 |
| NATHAN LUCAS, D.P.M., ) | |
| ) | |
| Defendant. ) | Notice of Forfeiture |

## INDICTMENT

**THE GRAND JURY CHARGES:**

At all times material to this Indictment:

### The Medicare Program

1. The Medicare Program ("Medicare") was a federal health insurance program, affecting commerce, that provided benefits to persons who were 65 years of age and older or disabled.

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS").

4. Individuals who qualified for Medicare benefits were referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

5. Medicare was divided into multiple parts with separate coverages: Part A covered hospital inpatient care; Part B covered physicians' services and outpatient care; Part C covered Medicare Advantage Plans; and Part D covered prescription drugs.

6. In order to receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare Part D drug plans were operated by private health care insurance companies approved by Medicare and referred to as drug plan "sponsors." These Medicare sponsors were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

7. CMS compensated the Medicare sponsors for providing prescription drug benefits to beneficiaries. CMS paid Medicare sponsors a monthly capitation fee for each beneficiary enrolled in the Medicare sponsors' plans. In addition, in some cases where a Medicare sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, CMS reimbursed the Medicare sponsor for a portion of those additional expenses.

8. Typically, Medicare did not process insureds' prescription claims directly. Instead, Medicare's drug plans were administered by Pharmacy Benefit Managers ("PBMs"), whose responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible pharmacies. PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

9. A pharmacy could participate in the Part D program by entering into a provider agreement with a Part D drug plan or with a PBM. Pharmacies entered into

contractual agreements with PBMs either directly or indirectly. If indirectly, pharmacies first contracted with pharmacy network groups, which then contracted with PBMs on behalf of providers. By contracting with drug plans or PBMs, directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations.

10. Upon receiving prescriptions, pharmacies submitted claims to Medicare or to PBMs for dispensing prescription drugs. Medicare or PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

11. Electronic claims submitted to Part D drug plans or PBMs by pharmacies located in Tennessee necessarily traveled via interstate wire to be adjudicated.

12. Medicare covered Part D drugs that were dispensed upon a valid prescription and for a medically accepted indication. Medicare generally only covered drugs meant to treat an existing illness or injury.

13. To prevent fraud, waste, and abuse, Medicare required providers, including pharmacies, to collect copayments from beneficiaries prior to or soon after the service or item was provided and specified that copayments could not be systematically waived or reduced. Consistent copayment collection was a fraud prevention measure, as copayments gave beneficiaries financial incentives to reject medications that were not medically necessary or had little or no value to beneficiaries' treatments.

**TennCare**

14. Medicaid was a program administered by the State of Tennessee, funded in part by the United States government, to provide health insurance services to eligible residents of Tennessee.

15. TennCare was the State of Tennessee's expanded Medicaid program, which provided insurance coverage to persons who may not have been eligible for the traditional Medicaid program.

16. TennCare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

17. TennCare contracted with private insurance companies to provide insurance services to eligible persons ("recipients"). These private insurance companies were referred to as managed care organizations ("MCOs"). Each MCO contracted with providers, who rendered items and services to recipients. The providers then submitted claims to the MCO, on behalf of the recipients, and received reimbursement based on those claims.

18. Each contract between a participating provider, such as a pharmacy, and a TennCare MCO contained specific language advising the provider, among other conditions, that claims submitted must be for covered services actually rendered in order to be reimbursed. Additionally, MCOs were required to include language advising about the potential penalties for false or fraudulent claims.

19. Generally, for an item or service to be appropriately reimbursable by TennCare, it had to be medically necessary to treat or diagnose the patient's medical

condition, it had to be safe and effective, and it had to be provided by a person authorized by law to provide the service.

### Foot Bath Medications

20.     Providers sometimes prescribed antibiotic and antifungal drugs to be used in foot baths. These foot bath medications were prescribed, purportedly, to treat a variety of fungal, bacterial, or other types of foot infections.

21.     Beneficiaries and recipients were prescribed a cocktail of expensive drugs (including capsules, creams, and powders), provided with a plastic foot tub free of charge, and instructed to mix the medications with warm water to soak their feet.

22.     These foot bath cocktails routinely included vancomycin 250 milligram capsules, calcipotriene 0.005% cream, clindamycin phosphate 1% solution, ketoconazole 2% cream, and other expensive drugs. Typically, the drugs selected for use in foot baths did not require pre-authorization from Medicare prior to prescribing them to a beneficiary. Additionally, the majority of these drugs were not subject to utilization management, meaning there was no limit on the quantity of drugs that could be ordered in a single prescription.

### The Defendant and Relevant Entities

23.     The defendant, **NATHAN LUCAS, D.P.M.**, was a resident of Shelby County, Tennessee.

24.     Advanced Foot & Ankle Care of Memphis, LLC ("Advanced Foot Clinic") was a Tennessee limited liability company formed on or about March 5, 1997. Advanced Foot Clinic, located in Memphis, Tennessee, was a podiatry practice owned and operated by **LUCAS**.

25.  DNL Pharmacy, LLC ("DNL Pharmacy") was a Tennessee limited liability company formed on or about May 20, 2016. DNL Pharmacy was a pharmacy owned and operated by **LUCAS** at the same address as Advanced Foot Clinic.

26.  Advanced Foot & Ankle Care of Memphis, LLC ("Advanced Foot Pharmacy") was a pharmacy owned and operated by **LUCAS** at the same address as Advanced Foot Clinic.

### The Fraudulent Scheme

27.  From in or around October 2018, and continuing through on or about the date of this Indictment, **LUCAS** executed and attempted to execute a scheme whereby he caused DNL Pharmacy and Advanced Foot Pharmacy to submit approximately $3,020,556.54 in false and fraudulent claims to Medicare, its sponsors, and PBMs for dispensing expensive foot bath medications prescribed by **LUCAS** that were not medically necessary and not eligible for reimbursement, of which Medicare, its sponsors, and PBMs reimbursed approximately $3,020,556.54. During the same time period, **LUCAS** caused DNL Pharmacy to submit approximately $978,165.56 in false and fraudulent claims to TennCare for dispensing expensive foot bath medications prescribed by **LUCAS** that were not medically necessary and not eligible for reimbursement, of which TennCare reimbursed approximately $818.69.

### Purpose of the Scheme

28.  The purpose of the scheme was for **LUCAS** to unlawfully enrich himself by:

a.  prescribing medically unnecessary foot bath medications to beneficiaries and recipients through Advanced Foot Clinic;

6

  b. causing the dispensing of those medications through DNL Pharmacy and Advanced Foot Pharmacy;

  c. shipping and delivering the medically unnecessary foot bath medications to beneficiaries and recipients;

  d. submitting and causing the submission of false and fraudulent claims to Medicare and its sponsors, PBMs, and TennCare for the dispensing of these medically unnecessary foot bath medications;

  e. receiving and obtaining the reimbursements paid by Medicare and its sponsors, PBMs, and TennCare based on the false and fraudulent claims submitted;

  f. concealing and causing the concealment of the submission of false and fraudulent claims to Medicare and its sponsors, PBMs, and TennCare; and

  f. diverting proceeds of the fraud for the personal use and benefit of **LUCAS**, and to further the fraud.

**Manner and Means of the Scheme**

29. The manner and means by which **LUCAS** sought to accomplish the object and purpose of the scheme included, among others, the following:

  a. In or around May 2016, **LUCAS** opened DNL Pharmacy within Advanced Foot Clinic.

  b. Beginning at least in or around October 2018, **LUCAS** utilized DNL Pharmacy primarily for the purpose of dispensing and billing for the dispensing of expensive foot bath medications.

  c. To maximize reimbursement from Medicare and its sponsors, PBMs, and TennCare, **LUCAS** chose medications to prescribe and dispense based on their

anticipated reimbursement and profit margin, rather than medical necessity. For example, **LUCAS** regularly prescribed vancomycin 250 milligram capsules, calcipotriene .005% cream, econazole 1% cream, and ketoconazole 2% cream in high quantities, and often with five automatic refills, because the medications reimbursed at high amounts by Medicare and its sponsors, PBMs, and TennCare, rather than because of the effectiveness of those medications or individualized patient needs.

        d.    **LUCAS** routinely prescribed these foot bath medications in contravention of the medically intended use of the medications. For example, vancomycin was an antibiotic indicated to be taken orally for the treatment of a specific bacterial infection of the colon. **LUCAS** regularly prescribed vancomycin 250 milligram capsules in quantities of 360 capsules per prescription or higher, to patients who did not have a bacterial infection. In at least one instance, **LUCAS** wrote a prescription for 1,080 vancomycin capsules to a beneficiary despite the beneficiary not having a bacterial infection.

        e.    Econazole was an antifungal cream indicated to be applied topically for the treatment of athlete's foot and other fungal infections. **LUCAS** regularly prescribed econazole cream in quantities of 2,550 grams per prescription—the equivalent of approximately 30 tubes of cream—to patients who did not have a fungal infection.

        f.    Likewise, ketoconazole was an antifungal cream indicated to be applied topically for the treatment of athlete's foot and other fungal infections. **LUCAS** regularly prescribed ketoconazole cream in quantities of up to 2,550 grams per prescription to patients who did not have a fungal infection.

        g.    **LUCAS** also routinely prescribed these foot bath medications,

including creams and capsules, despite some of them, such as ketoconazole, not being water soluble.

   h. In furtherance of the scheme, **LUCAS** utilized a pre-printed, check-the-box prescription pad designed to maximize reimbursement from Medicare and its sponsors, PBMs, and TennCare instead of addressing the medical needs of individual patients.

   i. **LUCAS** set quotas for the number of foot bath medications that had to be sent out by his staff each week. He also utilized a computer program to track the reimbursements and profit margins for his claims to Medicare and its sponsors, PBMs, and TennCare for the prescribing and dispensing of foot bath medications.

   j. **LUCAS** often did not counsel patients on how to use the foot bath medications. In many instances, **LUCAS** prescribed the medications without conducting a corresponding visit with patients and assessing their individualized needs. Nor did **LUCAS** follow up with patients regarding their compliance with the prescribed medication regimen or the efficacy of the prescriptions.

   k. To conceal the scheme, **LUCAS** caused DNL Pharmacy and Advanced Foot Pharmacy to routinely waive or reduce copayments of beneficiaries and recipients, regardless of whether patients were unable to pay their copayments.

   l. Following several audits by Part D plans and PBMs of DNL Pharmacy, **LUCAS** opened Advanced Foot Pharmacy in or around 2019, in order to avoid further scrutiny into his prescribing and dispensing of foot bath medications. In his provider enrollment application to a PBM for Advanced Foot Pharmacy, **LUCAS** concealed his ownership interest in DNL Pharmacy, along with the fact that he had

previously filed for bankruptcy.

      m.    From in or around October 2018, and continuing through on or about the date of this Indictment, **LUCAS** caused DNL Pharmacy and Advanced Foot Pharmacy to submit approximately $3,020,556.54 in false and fraudulent claims to Medicare, its sponsors, and PBMs for dispensing expensive foot bath medications prescribed by **LUCAS** that were not medically necessary and not eligible for reimbursement, of which Medicare, its sponsors, and PBMs reimbursed approximately $3,020,556.54.

      n.    During the same time period, **LUCAS** caused DNL Pharmacy to submit approximately $978,165.56 in false and fraudulent claims to TennCare for dispensing foot bath medications prescribed by **LUCAS** that were not medically necessary and not eligible for reimbursement, of which TennCare reimbursed approximately $818.69.

### COUNTS 1-5
### Health Care Fraud
### (18 U.S.C. §§ 1347 and 2)

30.    Paragraphs 1 through 26 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

31.    Beginning in or around October 2018, and continuing through on or about the date of this Indictment, in the Western District of Tennessee, and elsewhere, the defendant,

**NATHAN LUCAS, D.P.M.,**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title

18, United States Code, Section 24(b), that is, Medicare and its sponsors and TennCare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicare and its sponsors and TennCare.

32. The scheme to defraud is more fully described in Paragraphs 27 through 29 of this Indictment and is re-alleged and incorporated by reference as if fully set forth herein.

33. On or about the dates specified below, in the Western District of Tennessee, and elsewhere, the defendant, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, submitted and caused to be submitted the following false and fraudulent claims to Medicare for the dispensing of foot bath medications that were not medically necessary and not eligible for reimbursement, in an attempt to execute, and in execution of the scheme to defraud, as described in Paragraphs 27 through 29 of this Indictment, with each execution set forth below forming a separate count:

| Count | Beneficiary | Approx. Date of Claim | Drugs Dispensed | Approx. Amount Reimbursed |
|---|---|---|---|---|
| 1 | D.B. | 1/9/2019 | Vancomycin 250 milligram capsules, 360 capsules; ketoconazole 2% cream, 1,800 grams | $9,069.33 |
| 2 | V.G. | 1/24/2019 | Vancomycin 250 milligram capsules, 360 capsules; econazole 1% cream, 2,550 grams | $7,390.75 |
| 3 | B.B. | 2/12/2019 | Vancomycin 250 milligram capsules, 360 capsules; ketoconazole 2% cream, 1,800 grams | $9,069.33 |

| Count | Beneficiary | Approx. Date of Claim | Drugs Dispensed | Approx. Amount Reimbursed |
|---|---|---|---|---|
| 4 | D.R. | 4/23/2019 | Vancomycin 250 milligram capsules, 360 capsules; econazole 1% cream, 2,550 grams; calcipotriene 005% cream, 120 grams | $7,725.63 |
| 5 | J.R. | 7/16/2019 | Vancomycin 250 milligram capsules, 1,080 capsules; econazole 1% cream, 7,650 grams; lidocaine 2.5% cream, 180 grams | $18,266.94 |

Each of the above is a violation of Title 18, United States Code, Sections 1347 and 2.

## NOTICE OF CRIMINAL FORFEITURE
## (18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853)

34. The allegations contained in Counts 1 through 5 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982.

35. Upon conviction of any of the offenses set forth above, the defendant shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the violations, including but not limited to a sum of money equal to the amount of the gross proceeds of the offenses.

36. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    b. has been placed beyond the jurisdiction of the court;

    c.    has been substantially diminished in value; or

    d.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

                    **A TRUE BILL:**

                    _____
                    **F O R E P E R S O N**

**DATED:** _____

_____
**JOSEPH C. MURPHY, JR.**
**ACTING UNITED STATES ATTORNEY**

_____
**JOSEPH S. BEEMSTERBOER**
**ACTING CHIEF**
**CRIMINAL DIVISION, FRAUD SECTION**